IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

JOHNNY WHEAT, JR.                                              PLAINTIFF

V.                                          Civil No. 3:13-cv-984-HSO-RHW

RUSH HEALTH SYSTEMS, INC.                                      DEFENDANT

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BEFORE THE COURT is Defendant Rush Health Systems, Inc.'s Motion [40] for Summary Judgment and Memorandum [41] in Support. Plaintiff Johnny Wheat, Jr. has filed a Response [45] and Memorandum [44] in Support and Defendant a Reply [49]. After consideration of the parties' submissions, the record, and relevant legal authorities, the Court finds that Defendant's Motion [40] for Summary Judgment should be denied. Plaintiff's claims under the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 ("ADA"), for disparate treatment, failure to provide a reasonable accommodation, and retaliation will proceed to trial. To the extent that Plaintiff is now, in his briefing, attempting to pursue a constructive discharge claim, this claim will not go forward because it was not pleaded in the Complaint or administratively exhausted before the Equal Employment Opportunity Commission ("EEOC").

## I. FACTS AND PROCEDURAL HISTORY

Plaintiff has a hearing impairment and wears bilateral hearing aids. He was employed in various nursing positions at Rush Foundation Hospital in Meridian, Mississippi, from February 4, 2008, until August 8, 2012, when he resigned. Rush

is owned by Defendant Rush Health Systems, Inc.  Plaintiff alleges that Defendant discriminated against him on the basis of his hearing disability in violation of the ADA, failed to provide him a reasonable accommodation, and retaliated against him when he reported the discrimination and subsequently filed two Charges with the EEOC.

By all accounts, Plaintiff performed well during the first three years of his employment with Defendant.  Plaintiff, a Registered Nurse ("RN"), was assigned to the Medical Surgery Floor as a Charge and Preceptor Nurse, a supervisory position, and then assigned to a Staff RN position in the Post-Anesthesia Care Unit.  On February 6, 2011, Plaintiff accepted a position in the Orthopedic Surgery Unit as an RN Circulator.  This was Plaintiff's first position in the operating room, as opposed to "on the floor."  As an RN Circulator, Plaintiff assisted orthopedic surgeons during surgical procedures and prepared for procedures by performing such tasks as stocking the operating room and positioning patients.

On April 19, 2012, fourteen months after he was hired, Plaintiff was removed from his position as an RN Circulator and placed on administrative leave with pay. Defendant maintains that this occurred because Plaintiff was not performing well in his new position and posed a direct threat to patient safety. Defendant assisted Plaintiff in searching for another position with Defendant by recommending that he pursue certain jobs.  Plaintiff interviewed for several jobs suggested by Defendant but did not receive any offers.  A couple of positions that Defendant anticipated becoming available and suggested to Plaintiff did not become available.  Defendant

discussed clinic positions with Plaintiff, which paid significantly less than what Plaintiff earned as an RN Circulator but offered the work schedule Plaintiff desired. On May 1, 2012, Plaintiff accepted a clinic position in an urgent care clinic.  While Plaintiff initially received the same compensation he was paid as an RN Circulator, his compensation was soon reduced by almost six dollars an hour, which was commensurate with what other clinic nurses earned.  Plaintiff resigned on August 8, 2012, after learning that his compensation was being further reduced from $18.00 to $16.00 an hour.  Pl.'s Dep. [45-1] 38, 137-38.

On November 13, 2012, Plaintiff filed this Complaint, asserting claims pursuant to the ADA, as amended by the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (codified as amended in scattered sections of 42 U.S.C.). Defendant now seeks summary judgment on all of Plaintiff's claims.

## II. DISCUSSION

A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "[i]f the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law.  An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party."  *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.,* 276 F.3d 754, 759 (5th Cir. 2002). Where both parties have submitted evidence of contradictory facts, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 150 (2000); *see Tiblier v. Dlabel,* 743 F.3d 1004, 1007 (5th Cir. 2014).

B.    The Americans with Disabilities Act

"The Americans with Disabilities Act is an antidiscrimination statute designed to remove barriers which prevent qualified individuals with disabilities from enjoying employment opportunities available to persons without disabilities." *Seaman v. CSPH, Inc.,* 179 F.3d 297, 300 (5th Cir. 1999). The ADA prohibits discrimination against a "qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The term "discriminate" is defined to include "not making reasonable accommodations to the known physical and mental limitations of an otherwise qualified individual with a disability . . . ." 42 U.S.C. § 12112(b)(5)(A). The ADA also prohibits retaliation against an individual because he has opposed an act or practice made unlawful by the ADA or engaged in protected

-4-

activity, such as filing a charge with the EEOC. 42 U.S.C. § 12203(a). Plaintiff has pleaded and administratively exhausted three ADA claims: a disparate treatment claim, a reasonable accommodation claim, and a retaliation claim.

A plaintiff may prove discrimination or retaliation under the ADA through direct evidence or, alternatively, through indirect evidence using the *McDonnell Douglas* burden-shifting method of proof. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); *EEOC v. Chevron Phillips Chem. Co., LP,* 570 F.3d 606, 615 (5th Cir. 2009). In this case, Plaintiff utilizes the *McDonnell Douglas* framework. Under *McDonnell Douglas*, a plaintiff creates a presumption of discrimination or retaliation by establishing a prima facie case. *McInnis v. Alamo Cmty. College Dist.,* 207 F.3d 276, 279-80 (5th Cir. 2000)(ADA discrimination claim); *Feist v. La. Dep't of Justice, Office of the Att'y Gen.,* 730 F.3d 450, 452 (5th Cir. 2013)(ADA retaliation claim). Once a plaintiff does so, the burden shifts to the defendant-employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for the adverse employment action. This causes the presumption of discrimination or retaliation to dissipate. The burden then shifts back to the plaintiff to ultimately show that the employer's proffered reason is not true but is instead pretext for discrimination or retaliation. *McCoy v. City of Shreveport,* 492 F.3d 551, 557 (5th Cir. 2007). "[T]o satisfy step three of the *McDonnell Douglas* framework, a plaintiff must put forth evidence rebutting each of the nondiscriminatory reasons the employer articulates." *Jackson v. Watkins,* 619 F.3d 463, 467 (5th Cir. 2010).

C.    Plaintiff's ADA Disparate Treatment Claim

To establish a prima face case of disparate treatment, Plaintiff must show that: (1) he was disabled within the meaning of the ADA; (2) he was qualified and able to perform the essential functions of the job; and (3) he suffered an adverse employment action because of his disability.  *Neely v. PSEG Texas, Ltd. P'ship,* 735 F.3d 242, 245 (5th Cir. 2013).  According to Defendant, Plaintiff's disparate treatment claim cannot survive summary judgment because Plaintiff did not have a disability as defined by the ADA, he was not qualified for his position as an RN Circulator, and he did not suffer an adverse employment action.  Def.'s Mem. [41] 14-23.

1.    Whether Plaintiff was Disabled

"The term 'disability' means, with respect to an individual - (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))."  42 U.S.C. § 12102(1).  The ADA expressly identifies "hearing" as a major life activity.  42 U.S.C. § 12102(2)(A).  "In an ADA case, the relevant time for assessing the existence of a disability is the time of the adverse employment action."  *Chevron,* 570 F.3d at 618.  Plaintiff maintains that he suffered from a disability as defined by the ADA because he had a substantially limiting hearing impairment, and he was "regarded as" having such an impairment by Defendant.

Congress amended the ADA in 2008, and, in doing so, found that the holdings

of the United States Supreme Court in *Sutton v. United Air Lines, Inc.,* 527 U.S. 471 (1999), and *Toyota Motor Manuf., Kentucky, Inc. v. Williams,* 534 U.S. 184 (2002), had "narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect[.]"  Pub. L. No. 110-325, September 25, 2008, 122 Stat. 3553.  Congress provided that the Supreme Court's decisions had resulted in lower courts incorrectly finding "that people with a range of substantially limiting impairments are not people with disabilities."  *Id.*  The 2008 ADA as amended now directs courts to construe "[t]he definition of disability . . . in favor of broad coverage of individuals . . . to the maximum extent permitted by the terms of this chapter."  42 U.S.C. § 12102(4)(A).

The 2008 ADA Amendments became effective on January 1, 2009, and because they are not retroactive, "[m]ost recent Fifth Circuit cases have involved conduct occurring prior to the effective date of the [2008 Amendments] and have applied the pre-amendment standards."  *Mann v. Louisiana High Sch. Ath. Ass'n,* 535 F. App'x 405, 410 n.1 (5th Cir. 2013).  Because the events giving rise to this dispute occurred after January 1, 2009, the ADA Amendments apply here.  The parties have directed the Court to no Fifth Circuit precedent construing and applying the new Amendments, and the Court unfortunately does not have the benefit of such guidance.

EEOC regulations addressing the amended standards for determining disability provide:

-7-

(ii) An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

(iii) The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.
. . .

(v) The comparison of an individual's performance of a major life activity to the performance of the same life activity by most people in the general population usually will not require scientific, medical, or statistical analysis. . . .

29 C.F.R. § 1630.2(j)(1).

Plaintiff testified that he suffers from a genetic hearing loss and has worn bilateral hearing aids for eighteen years. Pl.'s Dep. [45-1] 21. Plaintiff's grandmother and grandfather were completely deaf, as are several of Plaintiff's aunts and uncles. *Id.* In his EEOC charge, Plaintiff stated that he suffers from an 80% loss of hearing in his right ear, and a 45% loss of hearing in his left ear. EEOC Charge [1-1] 1. In his deposition, Plaintiff averred that he suffers from an 80% hearing loss in his right ear and a 50 to 60% loss of hearing in his left ear. Pl.'s Dep. [45-1] 21. Plaintiff claims he was first prescribed hearing aids by Dr. Cater, a

doctor in Meridian, Mississippi, in 1993 or 1994, and that he was not accepted into the military because he failed its hearing test.  *Id.* at 22-24.  Plaintiff testified that he "can function normally under normal circumstances with [his] hearing aids" but, even with his hearing aids, has difficulty with "a lot of background noise and music and muffled voices, that kind of stuff."  *Id.* at 22.

Defendant does not contest that Plaintiff wears hearing aids and "has some form of a hearing impairment" but contends that Plaintiff's "alleged hearing issues have not affected any of his major life activities as defined by the ADA."  Def.'s Mem. [41] 14.  Defendant submits that "Plaintiff's only alleged hearing difficulty while at Rush concerned the fact that Plaintiff had trouble hearing some things if the radio was too loud in the operating room.  This does not amount to a disability."  *Id.* at 15.  Defendant maintains that Plaintiff's own testimony as to his hearing impairment, in the absence of medical records or other evidence, cannot sustain his summary judgment burden to establish an actual disability under subsection (A) of 42 U.S.C. § 12102(1).

Defendant's focus on Plaintiff's "trouble hearing some things if the radio was too loud in the operating room" is misplaced because this position centers around Plaintiff's hearing with the benefit of bilateral hearing aids.  The amended ADA provides that "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . hearing aids . . . ."  42 U.S.C. § 12102 (4)(E)(I).  EEOC regulations also indicate that medical analysis is usually not required in

order to establish an actual disability under 42 U.S.C. § 12102(1)(A).  29 C.F.R. § 1630.2(j)(1)(v).  Both parties, furthermore, have offered evidence reflecting that Plaintiff, at times, experienced difficulty hearing in the operating room.  Leslie Sanders, Defendant's Director of Surgical Services, testified that it had been reported to her that Plaintiff sometimes did not respond to others' statements in the operating room.  Dep. of Leslie Sanders [45-2] 16.  Plaintiff has demonstrated the existence of a genuine issue of material fact as to whether he had an actual disability.  *See* 42 U.S.C. § 12102(1)(A).

Plaintiff has also offered sufficient evidence creating a triable fact issue as to whether he was "regarded as" disabled under subsection (C) of 42 U.S.C. § 12102(1).  On October 17, 2011, Plaintiff was scheduled to assist Dr. Martin in a shoulder procedure but was "pulled off" the case by his immediate supervisor, Sherry Woodrick, who was a nurse coordinator for the Orthopedic Surgery Unit.  Pl.'s Dep. [45-1] 45-49, 76.  The same day, Plaintiff inquired to Sanders, Woodrick's immediate supervisor, about why he had been pulled off the case.  *Id.* at 47.  Plaintiff submits that he asked Sanders whether it was due to "positioning" or "safety" and that she said no.  *Id.* at 48.  According to Plaintiff and Plaintiff's contemporaneous notes from October 17, 2011, Sanders told him that the surgeons were frustrated with him because "sometimes you don't hear, and they have to repeat themselves."  Pl.'s Dep. [45-1] 78.

Based on the foregoing, Plaintiff has met his prima facie burden of establishing a fact question as to whether he had a disability as defined by the ADA

under subsection (A) and (C) of 42 U.S.C. § 12102(1).

  2. <u>Whether Plaintiff was a Qualified Individual</u>

  Defendant maintains that Plaintiff does not meet the definition of a "qualified individual with a disability" because he could not perform the essential functions of his job as an RN Circulator, regardless of the level of accommodation offered.  The ADA provides that a "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  This means that a plaintiff could either (1) perform the essential functions of the job; or (2) that a reasonable accommodation of his disability would have enabled him to perform the essential functions of his job.  *Burch v. City of Nacogdoches,* 174 F.3d 615, 619 (5th Cir. 1999).

  Defendant maintains that Plaintiff was removed from the Orthopedic Surgery Unit and placed on administrative leave with pay because he had repeated performance problems unrelated to his hearing that posed a direct threat to patient safety.  Defendant submits that Plaintiff's co-nurses in the Orthopedic Surgery Unit, and at least two of the four surgeons, lacked confidence in Plaintiff's abilities as an RN Circulator.  Def.'s Mem. [41] 16-20; Dep. of Dr. Martin [45-19] 7-8; Dep. of Dr. Rush [45-18] 10-12.  The precipitating event, which resulted in Sanders removing Plaintiff from the Orthopedic operating room, was an incident on April 10, 2012, when Plaintiff was assisting in transporting a patient into the operating room and purportedly positioned the patient in such a way that the patient was in danger

of sliding off of a bed.  Def.'s Mem. [41] 3-10; Witness Statements [40-23].

In response to Defendant's contention that he was unqualified, Plaintiff points to a Staff Assessment Form [45-4], dated September 9, 2011, forty days prior to Plaintiff being removed from Dr. Martin's case by Woodrick and Sanders.  The Assessment was Plaintiff's first and only evaluation as an RN Circulator, and he received a score of 9 out of 10.  Woodrick and Sanders signed the Assessment. Plaintiff has also offered the deposition testimony of two of the four surgeons he worked with in the Orthopedic Surgery Unit, Dr. Pomierski and Dr. Watson.  Dr. Pomierski testified that he did not have problems or complaints with Plaintiff's work performance.  Dep. of Dr. Pomierski [45-5] 9.  Dr. Watson testified that he did not recall any problems with Plaintiff's work performance as it pertained to patient safety or any "specific deficiency," though he noted that "sometimes" Plaintiff did not stock the operating room with such things as a Daptic, a dressing sponge, or a CryoCuff.  Dep. of Dr. Watson [45-17] 7, 11.

Both parties have offered evidence of contradictory material facts on the issue of whether Plaintiff was "qualified" as that term is defined by the ADA.  Summary judgment as to this element is inappropriate.

3.    Whether Plaintiff was Subjected to an Adverse Employment Action

The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment."  42 U.S.C. §

12112(a).  "A job transfer that includes a shift change that involves changes in duties or compensation or can be objectively characterized as a demotion may be an 'adverse employment action' under the ADA's anti-discrimination provision."  *Hunt v. Rapides Healthcare System, LLC,* 277 F.3d 757, 770 (5th Cir. 2001).

Defendant asserts that Plaintiff was not subjected to an adverse employment action because, after he was removed from the Orthopedic Surgery Unit and placed on administrative leave with pay, Defendant worked with Plaintiff in an effort to find him a comparable position, and Plaintiff chose to work in a lower-paying clinic position because he did not want to work weekends.  Def.'s Mem. [41] 20-22. Plaintiff maintains that he accepted the clinic position because Defendant would not allow him to work any longer in the Orthopedic operating room and that, while he interviewed for several jobs Defendant suggested, he did not obtain those jobs, and opportunities that Defendant anticipated becoming available and suggested to Plaintiff did not materialize.  Pl.'s Dep. [45-1] 61-70, 85-94.

Plaintiff claims in his second EEOC Charge:

> Greg Baldwin[, Defendant's human resources manager,] stated they would attempt to find me another position that I could do at the same rate of pay.  On or about April 26, 2012, Baldwin told me he had a clinic position open and asked me to try it for two weeks.  I asked him whether there would be a change in pay and he said he did not think so, but we may have to talk about it.  On May 1, 2012, I went to work at Urgent Care Clinic.  On May 11, 2012, I was told that my pay would be reduced from $21.57 to $18.00 per hour.  On May 25, 2012, I was told that I would only make $16.00 per hour working in the clinic.

Second EEOC Charge [1-2].

Defendant removed Plaintiff from the Orthopedic operating room.  While
Defendant assisted Plaintiff in searching for other another position with Defendant,
and Plaintiff interviewed for several jobs, the clinic position that Plaintiff
ultimately accepted paid significantly less and involved different job duties.  On the
other hand, the position accommodated Plaintiff's preferred schedule.  On these
facts, a reasonable jury could conclude that Plaintiff suffered an adverse
employment action.  Summary judgment as to this element would be inappropriate
based on the present record.

      4.    <u>Defendant's Legitimate Nondiscriminatory Reasons</u>

The burden now shifts to Defendant to articulate a legitimate
nondiscriminatory reason for the alleged adverse employment action.  *Daigle v.
Liberty Life Ins. Co.,* 70 F.3d 394, 396 (5th Cir. 1995).  Defendant's burden is one of
production, not persuasion, and Defendant need only produce "any evidence which,
taken as true, would permit the conclusion that there was a nondiscriminatory
reason for the adverse action . . . ." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks,* 509
U.S. 502, 509 (1993)).  Defendant has met this burden by offering abundant
evidence that Plaintiff was removed from the Orthopedic Surgery Unit because of
performance problems unrelated to his hearing.  Def.'s Mem. [41] 8-10.  Defendant
cites to several incidents which raise concerns about patient safety and substandard
performance, including evidence that Plaintiff refused constructive criticism from
his more experienced coworkers.  *Id.* at 3-5, 8-10.

-14-

5.    Pretext

Because Defendant has met its burden of production, the burden shifts back to Plaintiff to produce evidence that Defendant's proffered nondiscriminatory reasons are pretext for discrimination.  "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves,* 530 U.S. at 148.

Plaintiff contends that when he was "pulled off" of Dr. Martin's case on October 17, 2011, Sanders told him, "it's your hearing. . . . They don't like having to tell you something twice."  Pl.'s Dep. [45-1] 48.  If believed by a jury, this testimony could cast doubt on the validity of all of Defendant's stated nondiscriminatory reasons.  Summary judgment as to pretext is inappropriate, and Plaintiff's disparate treatment claim will proceed to trial.

D.    Plaintiff's Failure to Provide a Reasonable Accommodation Claim

It is unlawful for a covered employer not to make a reasonable accommodation "to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship."  42 U.S.C. § 12112(b)(5)(A).

> After the passage of the ADAA, a plaintiff in this circuit "'must prove the following statutory elements to prevail in a failure-to-accommodate claim: (1) the plaintiff is a "qualified individual with a disability;" (2) the disability and its consequential limitations were "known" by the covered employer; and (3) the employer failed to make "reasonable accommodations" for such known limitations.

-15-

*Neely v. PSEG Texas, Ltd. P'ship,* 735 F.3d 242, 247 (5th Cir. 2013)(citing *Feist,* 730 F.3d at 452).

For the same reasons stated in relation to Plaintiff's disparate treatment claim, Plaintiff has met his prima facie burden of establishing that he is a qualified individual with a disability.  Defendant does not contest the second statutory element to the extent that it is undisputed that Sanders and Plaintiff discussed Plaintiff's hearing difficulties on October 17, 2011.  The Court will focus on the third statutory element and Defendant's assertion that "once Plaintiff indicated to Rush management that he had a hearing impairment, management acted appropriately in an attempt to assist Plaintiff in his employment."  Def.'s Mem. [41] 23-27.

### 1.   Determining a Reasonable Accommodation

"The ADA provides a right to reasonable accommodation, not the employee's preferred accommodation."  *EEOC v. Agro Distrib.,* 555 F.3d 462, 471 (5th Cir. 2009).  The ADA defines the term "reasonable accommodation" to include reasonable modifications or adjustments that would enable the employee to perform the essential functions of his current job or "reassignment to a vacant position."  42 U.S.C. § 12111(9)(B).  "[W]hen an employer's unwillingness to engage in a good faith interactive process leads to a failure to accommodate, the employer violates the ADA."  *Loulseged v. Akzo Nobel, Inc.,* 178 F.3d 731, 736 (5th Cir. 1999).  However, "an employer cannot be found to have violated the ADA when responsibility for the breakdown of the informal, interactive process is traceable to

the employee and not the employer." *Id.*

The EEOC's interpretive guidance on the accommodation of reassignment

provides:

> In general, reassignment should be considered only when accommodation within the individual's current position would pose an undue hardship. . . .
>
> Reassignment may not be used to limit, segregate, or otherwise discriminate against employees with disabilities by forcing reassignments to undesirable positions or to designated offices or facilities. Employers should reassign the individual to an equivalent position, in terms of pay, status, etc., if the individual is qualified, and if the position is vacant within a reasonable amount of time. A "reasonable amount of time" should be determined in light of the totality of the circumstances. As an example, suppose there is no vacant position available at the time that an individual with a disability requests reassignment as a reasonable accommodation. The employer, however, knows that an equivalent position for which the individual is qualified, will become vacant next week. Under these circumstances, the employer should reassign the individual to the position when it becomes available.
>
> An employer may reassign an individual to a lower graded position if there are no accommodations that would enable the employee to remain in the current position and there are no vacant equivalent positions for which the individual is qualified with or without reasonable accommodation. An employer, however, is not required to maintain the reassigned individual with a disability at the salary of the higher graded position if it does not so maintain reassigned employees who are not disabled. It should also be noted that an employer is not required to promote an individual with a disability as an accommodation.
>
> The determination of which accommodation is appropriate in a particular situation involves a process in which the employer and employee identify the precise limitations imposed by the disability and explore potential

accommodations that would overcome those limitations. . . .

29 C.F.R. Pt. 1630, App. § 1630.2(o) (internal citation omitted).

This guidance is in accord with Fifth Circuit precedent.

> When no reasonable accommodation can be made to the plaintiff's prior job, he may be transferred to another position. The plaintiff bears the burden of proving that an available position exists that he was qualified for and could, with reasonable accommodations, perform. A disabled employee has no right to a promotion, to choose what job to which he will be assigned, or to receive the same compensation as he received previously.

*Jenkins v. Cleco Power, LLC,* 487 F.3d 309, 315 (5th Cir. 2007)(internal citations omitted); *see Allen v. Rapides Parish Sch. Bd.*, 204 F.3d 619, 622-23 (5th Cir. 2000)("The ADA does not require an employer to give an employee with a disability his job of choice especially when there are qualified individuals who desire the same position.").

According to Plaintiff, Sanders told him on October 17, 2011, that he was removed from Dr. Martin's case, not for safety or patient-positioning reasons, but because the doctors were frustrated with Plaintiff's hearing difficulties and did not like having to repeat themselves. Pl.'s Dep. [45-1] 48-49, 77-78. Plaintiff submits that Sanders told him that he had "30 days to turn it around" and that he should probably look for another job. *Id.* Within two days, Sanders "talked with all 4 surgeons to inform them then [sic] the radio must be at a level Johnny can hear discussions and instructions during surgical cases." Action Plan [40-13] 1. Plaintiff, however, testified that Dr. Martin and Dr. Rush continued to play loud music in the operating room, and on numerous occasions, Plaintiff was told to turn the music back up after he had turned it down. Pl.'s Dep. [45-1] 109, 113-14.

-18-

Plaintiff also testified that after meeting with Sanders, he was not allowed to work in the Orthopedic operating room as often and was assigned to more menial tasks such as answering the phone, stocking supplies, and pulling records.  Pl.'s Dep. [45-1] 56-57, 68, 73, 80-81, 109, 119.   This evidence raises a genuine issue of material fact as to whether Defendant attempted to provide Plaintiff with a reasonable accommodation that would allow him to perform the essential functions of his job as an RN Circulator.

As to the accommodation of reassignment, Defendant assisted Plaintiff in searching for another job with Defendant.  Plaintiff testified that Greg Baldwin, Defendant's human resources director, told him about roughly five possible job opportunities.  Pl.'s Dep. [45-1] 66-67.  Plaintiff interviewed for several jobs suggested by Baldwin that he did not receive, and a couple of positions that Baldwin anticipated becoming vacant did not materialize.  *Id.* at 61-70, 85-94.  Baldwin and Sanders suggested that Plaintiff pursue positions that required Plaintiff to work every other weekend.  Plaintiff rarely worked weekends as an RN Circulator and did not want to work weekends because he spent that time with his children and attended weekend church services.  *Id.* at 70, 142-43.

Defendant maintains that "Defendant offered Plaintiff several comparable positions" and that "[i]t should be dispositive of Plaintiff's claim that he turned down several comparable positions [and] has identified no request to be placed in a position that was both open and for which he was qualified."  Def.'s Mem. [41] 25.  The testimony cited by Defendant for this point does not indicate that Defendant

-19-

"offered" Plaintiff several comparable positions.  Baldwin testified that he and Plaintiff "discussed" clinic positions, a position as a "floater," a position in the "cath lab" that Plaintiff interviewed for but did not receive, and a supervisory nursing case management position that Plaintiff interviewed for but did not receive.  Dep. of Gregory Baldwin [45-6] 25.  Donnie Smith, Defendant's vice president of human resources, testified that "Scott was down at Watkins at the time, he was a nurse – director of nursing down there and – and we had some positions open down there," but Plaintiff "wanted to work a day job," "didn't want to be on call," and "wanted to be off on weekends," which limited the options for his employment.  Dep. of Donald Smith [45-7] 19.

While it is clear that Plaintiff was not interested in pursuing certain positions because of shift and compensation concerns, it is also undisputed that Plaintiff interviewed for several positions for which he was arguably qualified but did not receive any offers.  Other positions that Defendant anticipated becoming available and suggested to Plaintiff did not become available.  According to Plaintiff, Baldwin asked him to try a clinic position but did not tell him that accepting the position would result in a substantial decrease in pay.  Though Plaintiff was initially paid the same in the clinic position as he was paid as an RN Circulator, his compensation was soon reduced by almost six dollars an hour.  The evidence raises a genuine issue of material fact as to whether Plaintiff's reassignment to a clinic position was a reasonable accommodation.

2.     Pretext

Defendant contends that it "did everything it could to allow Plaintiff to continue working and succeed in his employment."  Def.'s Mem. [41] 30.  Plaintiff, on the other hand, testified that Sanders told him, "[t]hey don't like having to tell you something twice" and thereafter limited his assignments to more menial tasks. Pl.'s Dep. [45-1] 48.  While Defendant insists that it offered Plaintiff the accommodation of turning the music down in the operating room, Plaintiff testified that some of the surgeons ignored Sanders' direction to keep the music down. Plaintiff also testified that Smith, Defendant's vice president of human resources, told him on May 25, 2012, that "[i]t's time we get all this S-H-I-T settled. . . Your rate of pay is going to be $16.00 an hour. . . . It's going to be $16.00 [an] hour, and if you don't like that, then you can hunt something else. . . . [P]ut that in your little notes . . . ."  Pl.'s Dep. [45-1] 139-40.  Based on the current record, a genuine issue of material fact exists as to pretext, and Plaintiff's failure to provide a reasonable accommodation claim will proceed to trial.

E.     Plaintiff's Retaliation Claim

"To establish a prima facie case of retaliation under the ADA . . ., a plaintiff must show that (1) she participated in an activity protected under the statute; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse action."  *Feist,* 730 F.3d at 454.  "If the employee establishes a prima facie case, the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision.  After the

employer states its reason, the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation." *Id.* (citation omitted).

Reporting alleged discrimination to human resources and filing a charge with the EEOC constitute protected activities under the antiretaliation provision of the ADA, and Plaintiff has satisfied this element of his prima facie burden.  For the same reasons as addressed in relation to his ADA disparate treatment claim, Plaintiff has also shown the existence of a genuine issue of material fact as to whether he suffered an adverse employment action.  Defendant seeks summary judgment as to the third element, maintaining that Plaintiff has not provided evidence that any causal connection existed between his engagement in protected activity and the alleged adverse employment action.  Defendant also submits that Plaintiff has offered no evidence of pretext.

On September 9, 2011, Plaintiff was evaluated as an RN Circulator and received a score of 9 out of 10.  On October 17, 2011, Plaintiff was pulled off of Dr. Martin's case and allegedly told by Sanders that it was because of his hearing and not because of patient safety concerns such as positioning.  Pl.'s Dep. [45-1] 48. Within a week of this meeting and after Plaintiff reported Sanders' alleged comments to human resources, Sanders placed Plaintiff on a performance Action Plan [40-13], which provided that Plaintiff needed to improve in the areas of positioning the patients, prepping the Orthopedic operating room, and learning the instruments and supplies.  According to Plaintiff, this was "180 degrees from what"

Sanders had originally told him.  *Id.* at 57-58.  Plaintiff filed his first EEOC Charge in January 2012, and on February 10, 2012, he was written up for the first time in his four-year career.  Disciplinary Action Form [40-21].  He was removed from the Orthopedic operating room two months later.  Defendant offers plausible explanations as to why Plaintiff was counseled, disciplined, and removed from his position.  But viewed in the light most favorable to Plaintiff, the conflicting evidence creates material questions of fact regarding whether Defendant unlawfully retaliated against Plaintiff in violation of the ADA.  Plaintiff's retaliation claim will proceed to trial.

## III.  CONCLUSION

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that Defendant Rush Health Systems, Inc.'s Motion [40] for Summary Judgment is **DENIED**.  Plaintiff's ADA claims for disparate treatment, failure to provide a reasonable accommodation, and retaliation will proceed to trial.

**SO ORDERED AND ADJUDGED**, this the 15th day of July, 2014.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE

-23-